**Claude D. WEBER and Lois Weber, Plaintiffs-Respondents,**

v.

**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, a railroad corporation, Defendant-Appellant.**

**No. KCD 26895.**

Missouri Court of Appeals, Kansas City District.

Feb. 3, 1975.

**308**

Barkley M. Brock, Julius F. Wall, Clinton, for defendant-appellant.

Edward J. Murphy, Inc., E. J. Murphy, Butler, for plaintiffs-respondents.

Before WASSERSTROM, P. J., and SHANGLER and TURNAGE, JJ.

TURNAGE, Judge.

This is an appeal by the defendant railroad from an adverse jury verdict and judgment for $18,000.00 awarded to plaintiffs for the death of their sixteen year old son, Stephen Weber.

Plaintiffs and their son lived in Montrose, Missouri, at the intersection of Fourth Street and Texas Street.

Texas Street ran north and south and crossed the defendant's railroad tracks approximately a block south of the plaintiffs' home. Fourth Street ran east and west and intersected Kansas Street, another north-south street, about a block to the east of plaintiffs' home. Defendant's railroad tracks ran in a southwest and northeast direction. This placed the intersection of Fourth and Kansas Streets just north of defendant's tracks. The railroad tracks consisted of a house track located on the

north, the main track, which was about forty-five feet south and about four feet higher than the house track, and then a switch track located to the south of the main track.

The Webers had lived in Montrose for several years and the route down Fourth Street from the Weber house to Kansas Street then south across the railroad tracks was the normal way for the Webers to go downtown. There was no doubt Stephen Weber was very familiar with this route since he had traveled it many times.

Plaintiffs' evidence concerning the accident was that about 4:30 P.M. on May 12, 1971, Stephen Weber started from his home in the family station wagon, drove east on Fourth Street and turned south on Kansas Street and started to cross the railroad tracks. Plaintiffs produced evidence that defendant's train was entering Montrose from the southwest but no signal was sounded by the train itself, by either bell or horn or whistle. Plaintiffs' evidence did show there was a bell sounded at the California Street crossing, which was a block to the southwest of the Texas Street crossing.

There was evidence the vision from Fourth Street across a vacant lot and defendant's right-of-way north of the main track was obscured and defendant's fireman, who was on the train which struck Stephen, admitted some obstruction.

Plaintiffs' evidence was that from the time a car turned onto Kansas Street and crossed the house tracks, there was no vision toward the southwest so that it was impossible to see an approaching train unless the bumper of the vehicle was practically on the north rail of the main track and the head of the driver pressed against the windshield. Plaintiffs' evidence showed this obstruction in vision was caused by the growth of weeds, brush, saplings and trees in the area between the house track and the main track.

Defendant's train, at the time of the accident, consisted of thirteen cars and two engines. This train struck the station wagon Stephen Weber was driving on the passenger side at about the front door. The car was hurled back from the tracks and Stephen was thrown out of the car. When Mr. Weber arrived at the scene, he found skid marks from the front wheels of the car beginning about 5 to 6 feet north of the north rail of the main line and extending to the center of the area between the two tracks where there was a gouged-out space and marks indicating the wheels being pushed sideways.

The only warning at this crossing was a weather beaten crossarm.

Defendant's engineer and fireman testified the train was traveling 32 m. p. h. at the time it was going through Montrose and the front of the train was about 75 feet from the Kansas Street crossing when the fireman pulled the emergency stop. The evidence was that it took 800 feet for the train to stop.

Plaintiffs introduced an ordinance of the City of Montrose limiting the speed of railroad engines within the corporate limits to 15 m. p. h. Plaintiffs submitted their case to the jury on the disjunctive theories of failure to sound a warning after there was a reasonable likelihood of collision, or excessive speed.

On this appeal, "plaintiffs' evidence must be considered to be true and he must be given the benefit of any and all reasonable inferences therefrom and the aid of any evidence offered by the defendant which is favorable to him". Zumault v. Wabash Railroad Company, 302 S.W.2d 861 (Mo. 1957).

Defendant's first point is that Stephen Weber was contributorily negligent as a matter of law. To determine whether or not a defendant or a decedent was contributorily negligent as a matter of law, certain well defined principles have been evolved.

One of these is that before a court can declare contributory negligence exists

as a matter of law, such negligence must clearly appear from admitted or conclusively proved facts. *Zumault,* supra. The proof of plaintiff's negligence "must appear from evidence adduced by him or from evidence which he concedes to be true or from binding documentary evidence, or by proof of facts and circumstances by defendant which leave room for no other reasonable inference, or from a combination of them". Pipes v. Missouri Pacific Railroad Company, 338 S.W.2d 30 (Mo.1960).

"If reasonable men may honestly differ with respect to the inference to be drawn from such facts, then the question whether the driver exercised the care required for his own safety is for the jury." Houston v. Chicago, Rock Island and Pacific Railroad Company, 475 S.W.2d 4 (Mo.1972).

It was also held in State ex rel. Thompson v. Shain, 349 Mo. 1075, 163 S.W.2d 967 (banc 1942) that contributory negligence as a matter of law is seldom established by a defendant's oral testimony.

To demonstrate contributory negligence as a matter of law, defendant relies primarily upon the argument Stephen must not have been keeping a careful lookout or he would not have driven onto the track in front of the approaching train, and the oral testimony of a witness who lived on the north side of Fourth Street, who stated he saw Stephen Weber driving east on Fourth Street and could see the train approaching from the southwest. This witness was standing on his front porch, but there was no evidence introduced to show the visibility a driver of an automobile proceeding east on Fourth Street would have toward the southwest, except for the evidence noted above of obstructions in a vacant lot which lay between Fourth Street and the house track.

Defendant also relies on the testimony of its fireman who was on the left side of the engine, who testified he could see Stephen from the time he pulled out of his driveway until the time of impact.

■ Defendant also seeks to rely on the testimony of its fireman and engineer that they were blowing the whistle and ringing the bell constantly from the time they crossed the California crossing up until the time of impact. However, as pointed out above, on this appeal this court must accept the plaintiffs' evidence as being true and disregard the defendant's evidence except insofar as it may aid the plaintiff, or unless it is so conclusive as to bind the plaintiff.

■ Here, plaintiffs' evidence showed the train was being operated through town without sounding its bell or whistle and in excess of the speed limit established by the City of Montrose. This evidence further showed the view which Stephen had to the southwest was completely obscured from the time he crossed the house track until his front bumper was virtually on the northernmost rail of the main track. By defendant's evidence from the fireman, Stephen was only traveling at about 15 m. p. h. The jury could find Stephen had to look to his rear in order to see the train as he was proceeding east on Fourth Street and could then find he had to be alert and keep a careful lookout for traffic traveling on Kansas Street at the time he reached the intersection of Fourth and Kansas. The jury could further find from the time he turned south on Kansas Street that his vision to the southwest became quickly obscured and that he was completely unable to see the train until the point at about which the skid marks from his front wheels began.

Defendant's argument basically involves the proposition that the very fact Stephen did not stop his car before it crossed the track and was struck, in and of itself proves contributory negligence. This argument, that the driver did not have his car under control or it would not have crossed the track to be struck, was rejected in *Zumault, supra,* in this language: "the mere fact that the plaintiff did not stop his automobile before it fouled the track does not justify the conclusion as a matter of law that he was not exercising the degree

of care imposed by law upon the operator of a motor vehicle . . . such fact must be considered with all the other evidence in the case".

Perhaps one of the closest cases on its facts to the case at bar is the *Houston* case, *supra*. In that case the deceased driver left 78 feet of skid marks before her car crossed the railroad track and was struck by the train. The evidence in that case also indicated a failure to sound a warning and the visibility from the road was obstructed by brush and trees both along the highway right-of-way and the railroad right-of-way. The court held there it could not find evidence which was conclusive of excessive speed and the fact the deceased driver failed to stop prior to reaching the track was not conclusive proof of a lack of due care when considered with all the evidence favorable to the plaintiff. The court there concluded the determination of whether or not the deceased driver was guilty of contributory negligence was for the jury and not for the court.

The court in *Houston* also quoted with approval from Roques v. Butler County R. Company, 264 S.W. 474 (Mo.App.1924): "[t]he traveler can rely upon the statutory signals being given where his view is so obstructed that he cannot by the exercise of due care see an approaching train. If the traveler can hear and listens, and hears no signals and no sound of an approaching train, and cannot by the exercise of due care see an approaching train because of obstructions, then he is not required to leave his vehicle and go forward on foot to ascertain if a train is approaching, but in such case he may proceed relying upon and depending upon the statutory signals being given".

For another case similar on the facts see Baxter v. Missouri-Kansas-Texas Railway Company, 454 F.2d 25 (8th Cir. 1972).

Here the evidence, as set out above, compels the conclusion that reasonable men could differ with respect to the inference to be drawn from the facts surrounding this accident. Here the evidence was the view was totally obstructed from the time Stephen crossed the house track until he was virtually on the main track. Prior to that time the train would have been behind him, and the evidence is there was some obstruction to his view even if he had turned to look for a train to his rear. The fact he left 5 to 6 feet of skid marks before crossing the main track shows he did not slam heedlessly into the path of the oncoming train. In this situation, the question of contributory negligence was one to be resolved by the jury.

Defendant relies principally on *Pipes, supra,* and Silvey v. Missouri Pacific Railroad Company, 445 S.W.2d 354 (Mo.1969).

In *Pipes,* a teenager was approaching a railroad track late at night with his view of the track obstructed to a point, then with an unobstructed view of the track. The court found the driver negligent as a matter of law for failure to observe the headlight on the train, in view of the fact there was no evidence introduced showing the headlight not to have been burning and not to have been clearly visible. In *Silvey,* the plaintiff had not previously been over that crossing and observed flasher lights some 500 feet from the crossing which were not operating. As he approached the track his visibility was blocked by a hill and a screen of trees. He never did see any flasher lights but when 80 feet from the crossing, he heard a horn and saw a train. He immediately applied all of his brakes, but was unable to avoid striking the train. The court there held the plaintiff not to have been contributorily negligent as a matter of law, even though the court noted it would have so found him had it not been for the evidence of the inoperative flasher lights.

It is readily apparent that *Pipes* is not factually similar to the case at bar, nor is the dicta in *Silvey* applicable. Those cases announce the same rules to determine contributory negligence as set out herein.

However, the different factual situation here leads to a different conclusion. That being true, it was not error for the court to refuse defendant's motion for a directed verdict at the close of all the evidence.

Defendant's next point concerns a statement made by plaintiffs' witness, Charlotte Vogel. On direct examination, Mrs. Vogel was asked to describe the crossing, and was further asked to explain in her answer as to why she did not use the crossing. In reply the witness stated: "because after the last man was killed". Defendant's counsel immediately objected, and after a discussion at the bench, the court admonished the jury to disregard the last remark of the witness.

Defendant contends such remark was so highly prejudicial and inflammatory the instruction by the judge for the jury to disregard this remark did not remove its prejudicial effect. In Brown v. Parker, 375 S.W.2d 594 (Mo.App.1964), the court stated: "It has been held that where improper evidence comes into the case through a voluntary statement of a witness, a mistrial is not a matter of right but is a question calling for the exercise of a sound discretion by the trial court, and in the absence of an abuse of that discretion, we cannot interfere".

It is further stated in 5A C.J.S. Appeal and Error § 1737, page 1054: "In any event, whether error in admitting evidence is cured depends on the circumstances under which the evidence was given and its probable effect on the jury, and whether or not the improper reception of evidence is prejudicial depends on the relation of the evidence withdrawn to all the evidence in the case, how long it is left with the jury, and the surrounding circumstances". See also Eth v. Kansas City, 63 S.W.2d 203 (Mo.App.1933).

Here the answer of the witness was completely unresponsive and as soon as the statement concerning a man being killed was made, defendant's counsel objected and effectively prevented the witness from saying anything more along such unresponsive lines. After a short discussion at the bench, the trial judge admonished and instructed the jury to disregard that remark by the witness.

It could be debated as to whether or not the statement of a man being killed referred to the crossing involved in this case or perhaps involved some other incident which the witness was going to refer to or describe. In any event, the witness did not, in the answer given, refer directly to a man being killed at this particular crossing. Here the poison about to be injected into the case was promptly cut off, and the jury was quickly told to disregard it. In this circumstance, it cannot be said the experienced trial judge abused his discretion. He was in a position to see and hear the witness and to immediately judge the reaction of the jury to such remark. He was in a far better position than this court to decide whether or not this remark was so highly prejudicial and inflammatory that the defendant could not receive a fair trial because of it. The trial judge decided the defendant was not deprived of a fair trial by reason of this remark, and since no showing is made that he abused his discretion in this ruling, this point is ruled against the defendant.

Defendant next contends the court erred in submitting Instruction Number 3 to the jury, which submitted the "defendant knew or by the use of ordinary care could have known that there was a reasonable likelihood of collision in time thereafter to have sounded a warning but defendant failed to do so". Defendant argues there was no substantial evidence the defendant failed to sound a warning on this train and for that reason such Instruction was error.

Defendant relies principally on testimony by plaintiffs' witness, Deborah King, a thirteen year old girl who lived next door to the Webers, to show there was in fact a bell sounded on the train. Deborah testified at one point she could hear the bell ringing, but later clarified her answer to

indicate the bell she was talking about was the bell located at the California crossing and was not a bell on the engine of the train. Her testimony was that she had gone outside to watch the train go by with her baby brother and she did not hear any bell or whistle being sounded by the train itself.

Defendant, in its brief relies on Deborah's statement about hearing a bell, but a reading of her entire testimony leaves no doubt the bell she referred to was the one at the California crossing.

In addition to Deborah King, plaintiff produced Charlotte Vogel who testified she was visiting with her friend Paula Snyder on the telephone for about twenty minutes before Mrs. Snyder's daughter interrupted the conversation to tell of the accident on the railroad track. The Snyder home was about a block south of the Kansas crossing and Mrs. Vogel testified that in talking with Mrs. Snyder on previous occasions, they would have to discontinue their conversation while trains went through town because of the noise made by the train whistle. On this occasion, Mrs. Vogel said there had been no sound of a train whistle whatever, and in fact commented when told of an accident in the conversation, the accident at the Kansas crossing could not have been a train accident because she had not heard a train whistle at any time during her conversation.

The jury could well have found that both Deborah King and Mrs. Vogel were in a position to hear and were listening and did not hear any whistle or bell sounded by the train which struck the Weber car. In Dickerson v. Terminal Railroad Association of St. Louis, 284 S.W.2d 568 (Mo.1955) it was stated: "[b]ut if those who so testify are fairly in a position to hear, and are sufficiently attentive to hear, then their negative testimony is substantial evidence and does create an issue". See also Black v. Kansas City Southern Railway Co., 436 S.W.2d 19 (Mo. banc 1968).

The testimony of Deborah King and Mrs. Vogel meets the required test and this point is likewise ruled against the defendant.

The defendant further contends the trial court erred in refusing defendant's offer in evidence of certain photographs taken of the scene in January, 1973. The plaintiff objected to such photographs on the ground they did not depict the scene of the accident as it existed at the time of such accident. The plaintiff points out such pictures were taken at a time when natural foliage was not out, and further for the reason all of the weeds and other growth obstructing the view between the house track and the main track had been removed.

This court held in Fox v. City of Kansas City, Missouri, 343 S.W.2d 200 (Mo.App.1960): "[t]he admission of a photograph in evidence is proper only upon a showing by extrinsic evidence that it is a true and faithful representation of the subject, place or condition it purports to represent, as it existed at the time pertinent to the inquiry". Whether a photograph is sufficiently verified as such representation is a preliminary question to be determined by the trial court.

There is no doubt the photographs defendant offered were taken almost two years later and at a different time of the year, and after the weeds and growth shown to have existed by the plaintiffs' evidence had admittedly been removed. Thus, there can be no doubt the photographs were not a true representation of the scene as it existed on May 12, 1971. This being so, it was not error for the trial court to refuse to admit such photographs in evidence.

Finding no error in this case, the judgment is affirmed.

All concur.